No. 2166

Second Circuit

FULLER & VORDENBAUMEN

v.

BREWSTER

(May 13, 127. Opinion and Decree.)
(June 28, 1927. Rehearing Refused.)
(July 16, 1927. Writ of Certiorari and Review Applied For.)

(*Syllabus by the Court*)

1. **Louisiana Digest—Appeal—Par. 625.**
When the issue is one of fact, the appellate court will give much weight to the finding of the trial court and will not disturb its finding unless manifestly erroneous.

Chaffe vs. Barataria Canning Co., 113 La. 215, 36 South. 943.
Dun vs. Springfield Fire & Marine Ins., 109 La. 520, 33 South. 585.
Brady vs. Jay, 111 La. 1071, 36 South. 132.
Knotts vs. Midkiff, 114 La. 235, 38 South. 153.
Smith vs. Minden Lbr. Co., 114 La. 1035, 38 South. 821.
Rohr vs. Stechman, 11 La. 15, 43 South. 991.
Martinez vs. Fabacher, 118 La. 954, 43 South. 632.

Appeal from the First Judicial District Court of Louisiana, Parish of Caddo. Hon. E. P. Mills, Judge.

Action by Fuller & Vordenbaumen against H. C. Brewster.

There was judgment for plaintiff and defendant appealed.

Judgment affirmed.

R. C. Chandler, of Shreveport, attorney for plaintiff, appellee.

Pugh & Boatner, Byron A. Irwin, of Shreveport, attorneys for defendant, appellant.

STATEMENT OF THE CASE

REYNOLDS, J. In this suit plaintiff prays for judgment against defendant for $1750.00; $250.00 contracted to be paid to E. H. Vordenbaumen for finding a purchaser for defendant's rotary drilling rig at the price of $4500.00 and $1500.00 to be paid F. M. Fuller for finding a purchaser for the sme rig at $6000.00.

Defendant denied having employed plaintiff to find a purchaser for his drilling rig at any price or under any conditions.

On these issues the case was tried and there was judgment for plaintiff for the amount sued for and defendant appealed.

OPINION

In this case the evidence makes it clear that F. M. Fuller secured a purchased for defendant's drilling rig that defendant had agreed to take $4500.00 for at the price of $6000.00 in the person of F. B. Imboden who came from Dallas, Texas, to Shreveport, Louisiana, on the invitation of Mr. F. M. Fuller and his guarantee that he would pay Mr. Imboden's expenses both ways if he would come to Shreveport and examine the rig and was not pleased with it.

It is also clear that Imboden came to Shreveport and that Mr. Fuller showed him the rig and that through the efforts of Mr. Fuller he was completely "sold" on the rig.

It is also certain that defendant, who admits that he told Mr. Vordenbaumen he would sell the rig for $4500.00, sold the rig to Imboden for $6000.00.

And the only question for decision is did defendant agree to pay plaintiff the commission alleged.

E. H. Vordenbaumen testified, page 2:

"Q. Now, Mr. Brewster agreed that in case you should obtain a purchaser at this price of four thousand five hundred dollars ($4500.00) for this drilling rig that he would allow you a commission of two hundred and fifty dollars?.

"A. He did.

(Page 3):

"Q. All right, go ahead.

"A. So I went down to Mr. Brewster and told him we had got some parties from Dallas and would bring them over and try to sell this rig for him to them and Mr. Brewster said: 'All right, go ahead and sell it to them'. And I mentioned to him at that time that Mr. Fuller had agreed to sell it or had sold it, his rig for six thousand dollars, and we would substitute this one for the one he had sold if the parties agreed to buy it if Mr. Brewster would protect us for the difference between the forty-five hundred dollars ($4500.00) less two hundred and fifty dollars ($250.00) and the six thousand dollars ($6000.00).

"'Q. Now, at the time of this conversation between you and Mr. Fuller and Mr. Brewster, did Mr. Brewster agree to allow to you your commission of two hundred and fifty dollars ($250.00) that was mentioned in your first agreement?

"A. I don't know that that particular line of talk came up at that time, but the understanding was we were to be protected for seventeen hundred and fifty dollars ($1750.00), my two hundred and fifty dollars ($250.00) and Fuller's fifteen hundred dollars ($1500.00) making seventeen hundred and fifty dollars ($1750.00).

"Q. Was the price of forty-five hundred dollars ($4500.00) net to Mr. Brewster?

"A. Yes; less two hundred and fifty dollars commission to me, and Mr. Fuller had sold this, he was willing to sell this rig to these parties for six thousand dollars and make the difference and Mr. Brewster agreed to it.

(Page 18):

"Q. Well, now, it seems that you and M.r Fuller went down to Mr. Brewster's office after these people arrived. I believe you stated that.

"A. Yes, sir.

(Page 23):

"Q. Something has been said about two Mr. Fullers. Which Mr. Fuller was it?

"A. The oldest one. The last visit the youngest one came, too. All three of us were there.

"Q. All three of you?

"A. Yes, sir.

"Q. Did all three of you talk to Mr. Brewster, or did you talk to Mr. Brewster and they waited out in the other office?

"A. All three of us talked to Mr. Brewster to some extent, because Brewster was sitting in one corner and we were standing across facing him' and talking to him, and

there Mr. Fuller and his son and myself went in and Brewster said he had sold the rig to Palmer and some other man, and as a matter of fact he was right then and there selling it to Imboden.

(Page 30):

"Q. Now, it has been testified to that some few days after that or at some subsequent time, you went with Mr. Fuller to see Mr. Brewster again.

"A. Yes.

"Q. That is the second agreement?

"A. Yes.

"Q. And at that time Mr. Brewster agreed that he would make the sale for the price of six thousand dollars.

"A. Yes, sir.

"Q. And protect you and Mr. Fuller to the amount of seventeen hundred and fifty dollars.

"A. Yes, sir.

"Q. Then the price of the rig was to be forty-two hundred and fifty dollars net to Mr. Brewster.

"A. That is correct.

"Q. Now, acting under that agreement, Mr. Vordenbaumen, Mr. Fuller brought his parties over from Dallas?

"A. He did.

(Page 32):

"Q. And that the parties had been taken out by Mr. Fuller to look at the rig?

"A. Yes, sir.

"Q. And he told you at that time—you told him at that time that they had wired for the funds?

"A. Yes.

"Q. And he stated then that he would wait until the next morning?

'A. Yes."

F. A. Fuller testified, pages 40 and 41:

'Q. Now, Mr. Fuller, I will ask you the question whether or not you and your father and Mr. Vordenbaumen éver called on Mr. Brewster after this trip to the rig?

"A. Yes, sir; we three went down to see Mr. Brewster.

"Q. State who was present?

"A. Why Mr. Vordenbaumen, my father and myself went down to see Mr. Brewster and he was out in the shop and one of the men in the office called him in and we told him we had a party to buy the drilling rig at six thousand dollars, the drilling rig he had located up on the Belcher road and which Mr. Vordenbaumen was to sell for forty-two hundred and fifty dollars and Mr. Brewster was to give him two hundred and fifty dollars commission. We told him we had brought these parties over from Dallas and they were going to buy the drilling rig from us and pay six thousand dollars that we had rather make the fifteen hundred dollars off of his rig than to let ours go at six thousand dollars and he said that was all right; that he did not want his books to show that he had paid fifteen hundred dolars on a forty two hundred dollar sale and he would make the title to my father or to Mr. Vordenbaumen and we could transfer it for six thousand dollars."

F. M. Fuller testified, pages 557, et seq.:

"Q. All right, go ahead?

"A. And they were satisfied with the rig and willing to buy it, so we came back to Shreveport with them and Vordenbaumen and myself went to Brewster's and told him we had been out with them and they were satisfied with the righ and that they had wired their man somewhere to wire thirty-five hundred dollars to my credit at the Exchange National Bank here and stated to Brewster, it was then about two 'clock in the afternoon that possibly we would not get returns on it before the banks closed that day, but if we didn't we would be down the first thing the following morning and close the deal up.

"Q. What did Brewster say?

"A. He said all right. I stated to him: 'Now you consider the rig sold,' because I knew these men would not wire to somebody to send the money here unless they had the money, and he said: 'All right, I consider the trade closed'.

* * * *

"Q. Then, when you got back from your tour of inspection, you went down to see Mr. Brewster.

"A. Yes, sir.

"Q. You and Mr, Vordenbaumen went down?

"A. Yes, sir; and my son.

"Q. And your son?

"A. Yes, sir.

"Q. Three' of you?

"A. Yes, sir.

"Q. Just what did Mr. Brewster agree to do with you at that time?

"A. The agreement originaly was, Brewster was to have forty-two hundred and fifty dollars net; that Vordenbaumen was to have the two hundred and fifty dollars commission and I was to have fifteen hundred dollahs. Brewster knew nothing about me going to give Vordenbaumen two hundred and fifty dollars of mine.

"Q. Then how was that money to be paid to you?

"Q. What?

"Q. How was that money to be paid to you? How were you to get it?

"A. At that time, at that conversation, I suppose that Brewster was to accept the six thousand dollars and hand me fifteen hundred dollars and Vordenbaumen two hundred and fifty dollars.

"Q. hat was the agreement?

"A. Yes, that was the agreement, but it wasn't decided, you understand, as to how it was to be paid, only I was to be allowed to make fifteen hundred dollars profit on his rig in lieu of selling my rig.

* * * *

"Q. Now did he specifically agree that these folks which he had waiting outside of the door, as you term it, that he would not sell to one of these?

"A. He did; he agreed not to sell it to anybody until I got my parties here.

* * * *

"Q. Did he say: 'I am going to hold this and won't sell it to anybody else'?

"A. Yes.

* * * *

"Q. At that meeting Mr. Vordenbaumen and your son were present?

"A. Yes, sir.

'Q. Then you got a telegram from these people that they were coming over?

"A. Yes.

* * * *

"Q. Did he see that document?

"A. Yes, sir.

"Q. You are absolutely positive about that?

"A. Yes, sir.

"Giving him the names of these men?

"A. Yes, sir.

"Q. Was any mention made of these names besides the fact that you handed him the telegram? Did you mention who they were?

"A. Yes; Brewster asked me who they were and I told him and told him where they were stopping after they had gone out and looked at it.

* * * *

"Q. On the morning that this sale took place, I believe you stated a few minutes ago, you telephoned Mr. Brewster. Will you give the substance of that conversation?

"A. That I told him over the phone?

"Q. Yes.

"A. On the morning of the sale?

"Q. Yes.

"A. Well, I had sent my son down and found out the parties we had brought over were in Brewster's office. I then went to the telephone booth in the Youree Hotel and called Mr. Brewster, first calling Mr. Vordenbaumen and my son to hear me talk to Mr. Brewster, and I stated: 'Brewster, I want to state to you that I know you are selling that rig to my parties who I brought over here from Dallas. You have stated to me that you were selling it to Palmer, that you are dealing with my same parties and it is all right for you to go ahead and close out on it, but I want to notify you here and now that I am going to hold you to my commission of iffteen hundred dollars', and he stated: 'That is all right; leave that to me'. 'I will take care of that.' hTen, of course,

I kept away. I figured there was no way to get around paying these, what I was entitled to, so later in that day or the following day I went down to collect my fifteen hundred dollars and he told me I didn't have anything coming to me."

Under this testimony plaintifsf are entitled to a judgment as prayed for.

But defendant swears positively that he never entered into a contract whereby he agreed to pay either of the plaintiffs any commission, and in this he is corroborated in part by the testimony of A. O. Price, who testified that he never saw plaintiffs at defendant's office. But Mr. Brewster's testimony is negative, and when the testimony is reduced to its last analysis defendant submits his case to us under the difficulty of having three witnesses swear positively against his contention, and unfortunately for him he is the appellant and has to, overcome the presumption of correctness which attaches to the judgment of the lower court and discharge the burden of proving that the judgment is manifestly erroneous.

Under all the evidence and the settled jurisprudence established by a long list of authorities that where the evidence is conflicting the conclusion of the trial judge is entitled to great weight and will not be disturbed unless manifestly erroneous, we are unable to grant defendant the relief prayed for in his appeal.

It is therefore ordered, adjudged and decreed that the judgment appealed from be affirmed.